Case number 233418, Brent Adkins v. Marathon Petroleum Company LP. Oral argument not to exceed 15 minutes per side. Mr. Morgan for the appellate. Good morning, Your Honors. I'm Reed Morgan representing Brent Adkins. The overarching error made by the lower court in this case was that the judge had a concept that our entire case, as he phrased it, the crux of our case was that Brent Adkins was making a claim for low-level H2S exposure damage to his lungs. That was one of four claims. We had three other viable claims that were not contingent on causation being from H2S exposure. And, judges, let me read to you. When we were in the Darbert hearing, there was no summary judgment hearing held, but when we were in the Darbert hearing, the defense said we'd move to strike their opinions on other grounds as well relating to the plaintiff's training and assignment to job duties and work clearances and all those sorts of things, but those aren't related to the toxic causation that the court has indicated it's been wanting to hear from us. And that infected the judge's analysis of the rest of the case, his belief that we had to show H2S causation for our remaining Jones Act and unseaworthiness claims. It did not. But you did have to show causation, put the H2S aside. You still had to show causation at least for the unseaworthiness in Jones Act claims, right? No, Your Honor. Let me make this really clear. Under the Jones Act, there's an absolute duty to provide a reasonably safe place in which to work. Our Jones Act cases, we gave away the toxic torque case because of the lower court's ruling. We didn't want to go into abuse of discretion on that. Our remaining Jones Act claims are very, very concise and very adapted to the law of the Sixth Circuit, and I'll recite to you in a moment the Reynolds decision that says so. Our Jones Act claim is this. The plaintiff was not fit for duty by virtue of U.S. Coast Guard regulations. They're cited in our papers. The Coast Guard, for good reason, says if you're going to be working on a tanker barge, you have to have respiratory findings of above 75% of forced vital capacity, the ability to blow the air out in one second. When Mr. Adkins was hired, he had a 72.1%. Below? It says below 75% and the seaman has chronic bronchitis, emphysema, or COPD, and all those Adkins expressly said he didn't have. And the Coast Guard's just guidance. It's a guidance document. It's not binding. Yes, sir. And it says you have to have two things, and Adkins disclaimed the others. Judge, you're partially right with all due respect. Okay, tell me where I'm wrong. Okay, on April 30th of 2012, Brent Adkins had his third physical examination. It's in our brief. We recite how it happened. He told Mr. Lavelle at that time, the physician's assistant that had been giving these examinations, I've had episodes of bronchitis, asthma, and pneumonia. Now, your honor, believe this or not, he's tested and his forced vital capacity is down to 58% on one test and I believe 54 on the other. He's so abnormal, he is screaming out to anybody that knows what these documents mean, I've got a respiratory train coming at me and I'm about to pass out. Mr. Adkins is 6'3", 280. He's a tough man fighter. He wants to work. He's not concerned. He doesn't know that the reason he's becoming more and more breathless is because of his respiratory condition. The defendant knows because they have an obligation under the law to provide prompt and proper medical attention. Let me... I just want to make sure I understand your answer to my question. You're saying you don't have to show causation based on the Coast Guard guidelines? Is that your argument? We don't have to show any further causation but that a reasonable employer would say this man is showing signs of illness because the Coast Guard guidelines give us notice that if he has bronchitis, asthma, pneumonia, and a lower level than 75%. He's too ill to be out here on the ground around hydrocarbons. You still have to show causation. You still have to show what they did tied to his ultimate injury. It doesn't excuse you from elementary tort law. You're absolutely right. We have to show two things, Your Honor. You're absolutely right. We have to show foreseeability that it's foreseeable that he's going to have a problem, which he's certainly having by virtue of these test results and reports. And secondly, we have to show negligence, failure to use reasonable care. Judge Mathis's question. Judge Mathis's question is do you have to show causation? So imagine my hypothetical. Your client, he had tested 62 is what I have written down, but whatever you say is fine. Yes, sir. And he says he has bronchitis and he gets on a boat and they shouldn't have had him on a boat and he gets whacked over the head when they go over a wave. Right? Okay. Is the causation, is the reason for his injuries the bronchitis plus the 62? Well, no, not under your hypothetical, but please, let me explain what. Wait, just hold on a second. Judge Mathis's question is do you have to show causation? You say no in response. We have to show negligence, which of course encompasses causation in some sense. And what, I can't remember the other thing, but you still have to show causation and that's what you keep getting faulted not for showing. Okay, I'm with you, Judge. I want to answer your question. I didn't mean no, he doesn't have to show causation. What I meant to say was he does not have to show the hydrogen sulfide has caused the harm. That's what I mean. And what I am trying to implore the court to understand is if you are negligent as a medical provider, as a Jones Act employer, that negligence is imputed to you. You are responsible. The Sixth It says, in fact, we believe that Randall's case is analogous to those negligence lawsuits brought by semen who have suffered injuries as a result of the alleged negligence of medical providers who were selected by the semen's employers. That was Mr. Lovell. Mr. Lovell testified, I didn't understand what these numbers meant. I didn't explain to Mr. Adkins he was becoming ill. I didn't report it to the medical director. And they are releasing this fellow for four years as his every year his pulmonary function is declining way below normal. And that is a question of fact for a jury. This is a summary judgment. Every inference is to be construed in favor of the plaintiff. I struggle to see how you can establish causation without medical proof. Okay, well, let me address the medical proof that we had in this case. This case originally was filed in Louisiana in 2016 and we had a physician down there that's the medical director of the largest medical service in Louisiana, Ochsner Clinic, Dr. Gomez, head of the respiratory department. And Dr. Gomez was deposed by me for perpetuation in 2017, six years before this summary judgment and gave everything necessary. He gave the diagnosis. He gave the prognosis. He said being at this level of lung malfunction, you need to be treated. And the treatment is steroids. I don't see how Dr. Gomez qualifies as a treating physician as opposed to in anticipation of litigation when, as you just mentioned, I believe you first went to Dr. Gomez while the litigation was going on in Louisiana. So if he's a retained physician, then you have those hurdles you have to go through, expert report, things of that nature, which I believe you acknowledged you didn't submit, right? We submitted a letter that he had written, which was not a Rule 26 report, but Your Honors, he was the only treating physician that Mr. Adkins had. To win that, you have to argue that it's an abuse of discretion by the district court and I agree with Judge Mathis. It seems to me when you get someone in anticipation of litigation and you go to the visit with them, that's not traditionally what we think of and that's what Judge Cole found as a treating physician. That's what we call an expert. All you had to do is provide an expert report. That wasn't provided, that's excluded, and that's why we're struggling with causation. Let me help you all with causation. Dr. Sheila Butler, a retained expert, board certified in occupational health, testified in this case not to causation of injury by H2S, but she explained in her deposition that because of the levels of his pulmonary function, that he needed to be further investigation and her thesis was why do you run a spirometry test to see what the pulmonary function is and if it's abnormal, you have to test further, you have to find out what's going on with the lung, do you have obstructive disease, do you have restrictive disease, and you have to treat it. The lower district judge did not strike her as an expert witness. He did not. All he said was, if anything, that she didn't give an opinion on causation. Now I'm saying to your honors, reasonable minds can differ. The jurors could say, well we agree with the plaintiff, he got on the vessel with bad lungs, he got off four years later, 26 days before he got off, his pulmonary function was in the 50s, there was a progression. Now Butler, she said the condition was chronic, right? Chronic in the sense that yes, it was always there. And so when you bring your maintenance and cure claim, that wouldn't cover chronic conditions, correct? That is another error that the judge made. Yes or no, I'm sorry. No, it would be covered is what I'm trying to say. It would be covered. The Aguilar v. Standard Oil, United States Supreme Court case, 318 U.S. at 732, his employers responsible for maintenance and cure extends beyond injury sustained because of or while engaged in activities required by his place of employment. So we said in Blaney that a semen's condition, if it's chronic or permanent, the ship owner isn't liable. So let's set that aside for a second. When they, you say, I think on appeal, if I got it right, that there's two maintenance and cure claims. One's the FVC values and one is the hospital, May 26th hospital visit, right? That's true, yes. But when they moved for summary judgment below on the FVC values, you didn't respond. And when you moved affirmatively for summary judgment on that point, you only moved on the hospital. So why isn't the first one forfeited? Wait a minute. They're saying, we certainly responded by saying that he was in need of medical cure over and over while he was on the vessel. And so part of the... That's a different argument. But on the FVC values claim, we can look at your briefs, right? In your response to summary judgment, their motion, you're saying you responded. Right. And it's over and over. If you didn't, you agree you forfeited it. I'm sorry? And if you didn't, you agree you forfeited it. If we made no response, sure. But we spent days on our opposition to the dispute issues. In fact, there are over 71 disputed issues. In the 60s, they're claiming, their defense is, we waived our negligent assignment claim. I think it's around 60 or 61, 63. We specifically said the plaintiff should have been removed from service because he was not fit for duty per U.S. Coast Guard rules. And we're saying to your honors, reasonable minds can differ. We don't need an expert when we show that there's a Coast Guard violation for four years. A reasonable mind can say, we're going to infer this company didn't follow their own medical guidelines or reasonable medical practice and let this man go from bad to much worse to where he's on oxygen now, virtually not 24 hours a day, but certainly a good part of every day for the rest of his life when he was hired at age 36. Judges, I've been doing this maritime work for 47 years. I have never seen a clearer case under the Jones Act, an employer has a nondelegable duty to provide a safe place to work. A man that has failing lungs is himself unseaworthy. He is defective. You might want to wrap up unless you want to take some of your rebuttal time. Okay. Thank you, Judge Clay. I will simply say that he was the unseaworthy condition. The other unseaworthiness, which is not a negligence concept, was the method of operating this vessel and ignoring your medical reports is unseaworthiness. Defective method of operation is cognizable under the general maritime law. Thank you. Thank you. May it please the court. My name is Dan Massey. I represent the Appalee Marathon Petroleum Company. Since Judge Cole's order was entered, the appellant has tried to distance himself from the toxic portion of the case. Of course, this is a toxic case. There is no other mechanism of injury at issue here. This is not a slip, trip, and fall, an orthopedic case, a man overboard, or anything else. The Jones Act negligence and unseaworthiness claims, the maritime tort claims here, are all based on toxic theories and as your honors correctly pointed out, all require causation. That was an issue before the court, the lower court, on summary judgment and also of course during the two-day Daubert hearing that was held in which the district court took testimony from one of the appellant's expert witnesses, Dr. Pugh. In addition to there being no causation here for the maritime tort claims, there is really no negligence, no unseaworthiness, and also no injury either. To understand that, one needs to take a big picture view of the case. And what we have here is a seaman who had a rather unremarkable career working for Marathon up until the one event he had in May of 2012. Mr. Adkins hired on with Marathon as an experienced seaman. He had worked for other inland river carriers in the past, so he was not a greenhorn. Prior to being hired by Marathon, he went through a functional capacity evaluation with a third party. He did exercises on a training pad at the Marathon Marine Facility to demonstrate his ability to handle the job and he also underwent a work clearance. The work clearance took all sorts of things from Mr. Adkins. It did a gross physical exam. It took some pulmonary function test results. He had to fill out some questionnaires about his medical history, vision and hearing screenings, and so on and so forth. He passed that work clearance. Those types of work clearances, and they also took place two years later in 2010 and after that in 2011, were not medical treatment. Mr. Adkins had his own personal physicians who cleared him to work for Marathon on a number of occasions as well. Now, the oxygen levels are going down. I think you acknowledged they're going down over the years. Is there anything that Marathon has to do in response to that? Your Honor, if I may correct you, I believe it was the pulmonary function test results. Some of those may have gone down over the years, not his oxygen levels. As a point of clarification, his oxygen levels are very good, suggesting he's a healthy guy or reasonably healthy. But what about the test judgment? Some of the pulmonary function tests did go down over time. Marathon paints a different picture of what his test results mean than Mr. Adkins does. Marathon's experts says his test results were not outside the realm of normal. What about the Coast Guard guidance that says under 75% is a problem, and he was down to 62%. He says 58, 54, whatever it is, something lower. The Coast Guard guidance, and I believe Your Honor is referring to the NAVIC 04-08, and that is exactly what it is, Coast Guard guidance, Your Honor. But as Your Honor brought up earlier, it mentions the 75% PFT rating, as well as some other things, and there's two things, either a diagnosis of emphysema, COPD, or chronic bronchitis. And he had been diagnosed with none of those, or a hospitalization. He says the third time in April 2012, he said he had those. I think the correct, to be correct, he said he had had bronchitis in the past. There was no diagnosis of chronic bronchitis. And then the second factor there would be hospitalization for an asthma attack in the last two years, which there was also none. In 2010, it's very important to note, in conjunction with his Marathon company work clearance, he also underwent and passed a U.S. Coast Guard physical exam. And in that exam, took much of the information of the sort that Marathon used in its physical exams, looked at Marathon's physical exams, and determined that he was fit to hold two licenses, two Coast Guard licenses, one a Merchant Mariner credential, and also a Tankerman's license. So he was, in addition to being cleared by Marathon every other year during the course of his employment, and by his personal physicians, he was also cleared by the United States Coast Guard. The regulations, and I believe NAVIC 0408, make the Coast Guard the ultimate authority on whether a seaman is capable of doing the work. The Coast Guard decided that he was. That license remained in effect throughout the rest of Mr. Adkins' employment with Marathon, and was never withdrawn or restricted or suspended during that time. As part of Mr. Adkins' exams and work clearances with the company, he was also asked whether or not he ever had difficulty doing his work, doing the deck work, doing the job as a deckhand or a mate or a Tankerman, and he always responded no. With respect to the medical claims here, Mr. Adkins asserts a medical negligence claim under the Jones Act, and he argues as a corollary claim under the doctrine of seaworthiness. Marathon never intended or sought out to provide any medical care to Mr. Adkins. They cleared him to work on several occasions. To the extent that Marathon ever did provide any medical care to Mr. Adkins or assist with that, it was related to that one workplace event he had in 2012. And there's argument on this in the briefs, but the authorities that Mr. Adkins cite vary substantially from what we're dealing with here. There's three main authorities they cite, Dicentino, Sambula, and Cordis. Two of those are Fifth Circuit decisions, one second. They all involve blue-water, ocean-going vessels, several of which had their own doctors, but they involve far different situations than here. They all involve emergency situations in which a guy needed help right away. The Jones Act and the general maritime law do not obligate a shipowner to provide routine medical monitoring at all times, to provide preventative care, or to operate as a person's primary care physician. What the law requires and obligates a shipowner to do is take care of the seaman when there's an emergency situation due to the perils of the sea. That may differ in a blue-water context than it does on the Ohio River where you can pull over. That's just what happened here. On May 26, 2012, Mr. Adkins was working on the deck of a barge, working the front watch, became overheated, started feeling poorly, walked in off the barge, and was taken to a hospital here in the Cincinnati area. There he described his symptoms. He told the treating physician what he had been doing. There was no mention of any type of chemical exposure or unsafe or unusual event that happened. The treating physician decided that he had just been overheated, his symptoms had improved with rest and cooling off, and he was discharged. He was discharged at that time at maximum cure from his heat-related illness that he experienced on that day. The only time Mr. Adkins needed care while on the vessel and while in the service of a marathon ship, he got it. He got it promptly, his symptoms were resolved, and that was the end of it. Whether under the General Maritime Law or Jones Act, if one wants to argue that that May 26, 2012 event was the manifestation of a permanent injury or a progressive lung disease, more is required. You have to show a link between the service to the ship and the incident that happened that day with a diagnosis of the illness. And as far as the medical negligence claim, there's really two ways in which a ship owner can be negligent. They can be directly negligent, they can be vicariously negligent. Directly when the ship owner fails to get the injured seaman medical care. The ship owner can also be vicariously liable by getting the injured seaman to a treater who then commits an act of malpractice or something along those lines. The authorities that Mr. Adkins cite, like I said, are far different. As an example, Sambula involved a seaman who had a gouged out eye, basically, who was taken by the ship owner to a physician who did not speak the same language and who more or less put a Band-Aid over the man's eye. The man ended up losing the eye as a result, and the company was found negligent. That's the sort of situation that there has to be for there to be medical negligence, something totally different than exists here. Cordis, there aboard a ship, a man had a 104-degree fever, he was coughing up blood and really unable to get out of his bunk. The ship owner forced him to continue work anyway, and he was not taken to the hospital or provided medical care and then later perished, later died. There, the ship owner was found to be liable under a direct theory for not getting the seaman the care he needed. Of course, here, no such situation. And then lastly, Sambula, which is the most recent case out of the Fifth Circuit, a seaman went into diabetic shock aboard the vessel, was not treated for it properly, was diagnosed as having the flu and subsequently died. And it turned out that he would have recovered likely had he been diagnosed properly. The ship owner did not get him to a competent doctor. There was a vicarious liability situation. Nothing like that here. No claims of negligence were even made against anyone who saw Mr. Adkins at the ER the date of his lone work incident. Simply put here, Mr. Adkins cannot establish in his maritime tort claims of Jones Act negligence or unseaworthiness without a causation element, and it's woefully lacking here. With respect to the claim for maintenance and cure, the only claim for maintenance and cure here is with respect to what happened on the 26th of May, 2012, which resolved itself with rest, with cooling off, and when he was discharged from the hospital by the treating ER physician that day. Marathon requests that the court's order in the district court be affirmed, and that's all I have, Your Honors. Thank you very much. Any rebuttal? Yes, Your Honor. First, obviously the pulmonary function test that we've been referring to repeatedly or probative that something was going on with Mr. Adkins' lungs that was abnormal. Irrespective of whether a physician for Marathon thought so or not, the Coast Guard had already said that would be an indication. Mr. Massey says in 2010 he underwent a U.S. Coast Guard exam, and it was based upon that that he was fit for duty. There's no evidence in this record that the U.S. Coast Guard ever did an examination on Mr. Massey. That 2010 examination is on a Marathon Oil Company form if you look at it. It's dated 32510. It's a U.S. Coast Guard physical. They set out the protocol. Marathon did that exam. The other thing that I wanted to make note of since I've got a short period of time here, in the disputed issues of fact, on number six, they claim that Adkins underwent another physical exam, March 25, 2010, that was similar in nature but which also included a U.S. Coast Guard medical exam. Nothing remarkable was noted in his periodic history. That's false. What was remarkable was that his pulmonary function was below 70. It was around 67 or 68 at that time. If you look at number 13, disputed issue of fact number 13, they say Adkins never appeared to have any physical or medical problems or difficulties while working. Our response says the pulmonary spirometry test was given while he was working. He was employed. He was going to work every day and was incompetently and incompletely interpreted with no follow-up. See Dr. Butler's testimony. Number 14, they, the defendant says Adkins underwent another physical exam, April 30, 2012, similar in nature. It was a similar history with the exception. This is Marathon talking. With the exception, Adkins noted having a history of asthma, pneumonia, and heart arrhythmia. Too fast of a heartbeat. When he was hired, he had too fast of a heartbeat. If you look at the ergo examination, they flunked him in November of 2008 and said your heart is too rapid for heavy-duty work. Marathon ignored it and put him into heavy-duty work. Number 16, they say MPC was not Adkins' personal physician or medical provider. We respond at the bottom of that page. It's in our briefing on the dispute issues of fact, page 8 of 25. We recite paragraph 5 of the MPC health manual that says the organization is to develop procedures to ensure employees are physically capable of using a respirator and medical evaluations are completed prior to fit testing. I want to wrap up your real life's been on for a little bit. Okay. In other words, their own book says he's got to be fit for wearing a respirator. Dr. Butler and Dr. Gomez both said you can't wear a respirator when you're below 75. You need to be tested for that. In sum, I would say this is in your hands, judges. This is a sick man with a liberal statute that was written for the protection of semen. The judge failed to follow Rule 56F. If he was going to try this case on causation other than toxic tort under Rule F, 56F, it says give him notice and give him time to reply. He did not do that. 56C says if there's any evidence whatsoever reasonable minds can differ, you can't grant a summary judgment. It's not a trial. He didn't follow that rule. He didn't follow the law of Reynolds that says every inference, reasonable inference is in favor of the plaintiff and the Jones Act is to be liberally applied. Thank you. Thank you. And the case is submitted.